## ED BURGE v. THE STATE.

### No. 3062.    Decided April 15, 1914.

### Rehearing denied May 13, 1914.

**1.—Rape—Sufficiency of the Evidence.**

Where, upon trial of rape by force, the evidence, although conflicting, was sufficient to sustain the conviction, there was no reversible error.

**2.—Same—Evidence—Credibility of Witness—Motive.**

Where a State's witness was material for the State and testified, among other things, that appellant caused to be paid to the husband of prosecutrix a certain sum of money to keep her from testifying, of which the witness received a part, etc., and defendant developed that in addition to having this prosecution brought the prosecutrix had filed against defendant a suit for damages, and on cross-examination of said witness, defendant asked him if he was going to get a part of the amount sued for, to which the witness answered in the negative, there was no error in not compelling said witness to further answer

that if he did not think he was entitled to it; in the absence of an agreement or understanding to that effect.

**3.—Same—Evidence—Expert Testimony—Consent.**

Where, upon trial of rape by force, defendant's witness, after qualifying as an expert, in answer to a hypothetical question, had testified that a woman in. the position stated and under the circumstances enumerated could not be raped without leaving evidence of physical violence on her person, there was no error in not permitting him to answer the question whether a man could have carnal intercourse with a woman in that position with her consent; as there was no question of intercourse by consent in the case.

**4.—Same—Misconduct of Jury—Evidence Dehors the Record.**

Where the record on appeal disclosed that on a former trial the defendant received a sentence of ten years for the offense of rape, while in the instant case he only received seven years, and further disclosed that there was no discussion among the jurors of said former conviction; although it may have been incidentally mentioned by one juryman who was at once informed that this matter could not be discussed or considered, there was no reversible error; besides, if such remark was made, it was after the jury had agreed to find a verdict of guilty. Following Arnwine v. State, 54 Texas Crim. Rep., 213.

**5.—Same—Evidence—Complaint of Prosecutrix—Res Gestae.**

Where, upon trial of rape by force, the evidence showed that the alleged rape occurred in the early forenoon hours and that the prosecutrix remained at the house of the defendant until after dinner, when she complained to various witnesses as to the outrage committed upon her, and that she was afraid to leave the premises sooner, there was no error in admitting further testimony that she was in a highly nervous condition at the time, and remained so for two days thereafter; and the fact that she did not complain sooner only went to the weight of the testimony.

**6.—Same—Evidence—Declarations of Third Party—Charge of Court.**

Upon trial of rape by force, there was no error in admitting in evidence the statements, acts and declarations of the son of the defendant who at. the instance of the latter used money given him by the defendant to induce the prosecutrix to induce the county attorney to dismiss the prosecution against the defendant, it having been shown that the defendant had made him his agent in·this matter, and the court giving proper instructions on said testimony; and there was no error in refusing special instructions not to consider the same.

**7.—Same—Charge of Court—Consent.**

Where, upon trial of rape by force, which defendant denied in toto, stating that he had had no sexual intercourse whatever with prosecutrix, and the question of consent was not in the case, there was no error in refusing a requested instruction that the consent of the prosecutrix would be presumed until the State proved beyond a reasonable doubt that she used all means in her power to prevent the offense; besides, the court submitted a charge on consent, and there was no error.

**8.—Same—Evidence—Conversation.**

Where, upon trial of rape by force, it developed that the prosecutrix was the housekeeper of defendant at the time, there was no error in admitting the conversation between them at the time of her employment as such, in which she stated that she was a lady and wanted to go to a nice place.

**9.—Same—Conduct of Prosecutrix During Trial.**

Where the record showed, on appeal from conviction of rape, that while the private prosecutor was addressing the jury, the prosecutrix was sitting in plain view and hearing of the jury and crying loud enough for the jury to hear her, but not in a manner to interrupt the orderly proceedings of the court, there

was no reversible error in overruling defendant's motion not to permit her to remain in the presence of the jury.

### 10.—Same—Evidence—Credibility of Witness.

Where a State's witness had testified that he was a go-between of defendant and the prosecutrix to induce her to prevail upon the county attorney to dismiss the prosecution, and had received for this purpose part of the money paid by defendant to the husband of the prosecutrix, and it was also shown that prosecutrix had sued defendant for damages in committing rape by force upon her, there was no reversible error in not permitting counsel for defendant to compel the witness to answer whether he was entitled to a child's part of the amount that might be recovered in said suit; in the absence of an agreement to that effect or legal obligation, his interest and bias having been fully shown.

### 11.—Same—Accomplice—Accessories—Charge of Court—Motion for Rehearing.

Where the appellant for the first time, in his motion for rehearing, claimed that the trial court erred in not instructing the jury that certain State's witnesses were accomplices, the same could not be reviewed; besides, the fact that these witnesses offered or accepted money to leave the State or desist from prosecution would not make them accessories or accomplices. Following Chenault v. State, 46 Texas Crim. Rep., 351, and other cases. Overruling Gatlin v. State, 40 Texas Crim. Rep., 116.

### 12.—Same—Evidence—Complaint of Prosecutrix.

Upon trial of rape by force, after the prosecutrix had testified to her nervous condition after she claimed she had been assaulted by defendant, there was no error in permitting her to testify further that this nervous condition continued for about a week. Following Jacobs v. State, 66 Texas Crim. Rep., 146.

### 13.—Same—Sufficiency of the Evidence.

Where, upon trial of rape by force, the testimony showed that defendant came up behind prosecutrix, grabbed her hands, pinioned them behind her, threw her on the bed and outraged her by force, the conviction was sustained. Davidson, Judge, dissenting.

Appeal from the District Court of Collin. Tried below before the Hon. F. E. Wilcox.

Appeal from a conviction of rape by force; penalty, seven years imprisonment in the penitentiary.

The opinion states the case.

*G. R. Smith* and *W. R. Abernathy,* for appellant.—On question of insufficiency of the evidence: Perez v. State, 50 Texas Crim. Rep., 34, 94 S. W. Rep., 1037; Adkins v. State, 65 S. W. Rep., 924; Price v. State, 35 S. W. Rep., 988; Arnett v. State, 51 S. W. Rep., 385; Rushing v. State, 80 S. W. Rep., 527; Dina v. State, 78 S. W. Rep., 229.

On question of refusing appellant's counsel to ask State's witness whether he was entitled to part of the money recovered on damage suits: Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 612; Earles v. State, 64 Texas Crim. Rep., 537; Curry v. State, 72 Texas Crim. Rep., 463, 162 S. W. Rep., 851; Gelber v. State, 56 Texas Crim. Rep., 460; Sexton v. State, 48 Texas Crim. Rep., 497; Green v. State, 54 id., 3.

On question of consent: Richardson v. State, 49 Texas Crim. Rep., 391.

On question of misconduct of jury: Casey v. State, 51 Texas Crim.

Rep., 433; Railey v. State, 58 id., 1; Wyatt v. State, 58 Texas Crim. Rep., 115, 124 S. W. Rep., 929; Clements v. State, 69 Texas Crim. Rep., 369, 153 S. W. Rep., 1137.

On question of complaint of prosecutrix: Bailey v. State, 9 Texas Crim. App., 98; Williams v. State, 34 id., 337; Dicker v. State, 32 S. W. Rep., 541; Reddick v. State, 34 S. W. Rep., 274; Clark v. State, 45 S. W. Rep., 696; Pefferling v. State, 40 Texas, 487; Salazar v. State, 55 Texas Crim. Rep., 307, 116 S. W. Rep., 819; Cowles v. State, 51 Texas Crim. Rep., 498, 101 S. W. Rep., 1128.

On question of admitting testimony of son of defendant to induce prosecutrix to have county attorney to dismiss prosecution, etc.: Barnes v. State, 61 Texas Crim. Rep., 37, 133 S. W. Rep., 887.

*C. E. Lane*, Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was prosecuted and convicted of rape by force, and his punishment assessed at seven years confinement in the State penitentiary.

The record is rather voluminous, and in passing on the questions presented we will take them up in the order discussed in appellant's brief, and in their able oral argument before this court. He first discusses at length the improbability of the testimony for the State being true, and while admitting that Mrs. Vaden testifies to facts which show that she was raped by appellant, yet it is insisted that the offense could not have been committed in the way testified to by her. Enough of the testimony will hereinafter be stated to show we think this contention ought not be sustained by us.

The next contention is, "When the State has introduced a witness, who is a material witness for the State, and who testifies to material and prejudicial facts against the defendant, such defendant on cross-examination has the right to show any fact or circumstance which will affect the credit of the witness before the jury." This is a sound proposition of law, and if the court had excluded any such testimony, it would be error. J. M. Matthews was a most material witness for the State, and testified, among other things, to appellant paying or causing to be paid to the husband of Mrs. Vaden $750 to keep her from attending court and testifying against him; the court permitted it to be shown that the husband of Mrs. Vaden gave him (Matthews) one-fourth of this amount Appellant then developed that in addition to having this prosecution brought, Mrs. Vaden had filed a suit against appellant for $50,000 damages. In cross-examination of Matthews appellant asked him if he, Matthews, was going to get one-fourth or a child's part of the amount sued for and recovered as damages, to which question Matthews answered, no. Appellant then asked him if he did not think he was entitled to it. Whatever may have been the witness' opinion as to what he thought he ought to be entitled to, would be inadmissible, when he answered he was not going to get any part of it. Matthews was in no way related

to Mrs. Vaden, and as a matter of law was not entitled and could recover no part of any sum that Mrs. Vaden might get, if anything, and as he had testified that there was no agreement or understanding that he was to be given any part of it, his opinion about what Mrs. Vaden ought to do in case she recovered, would not be legitimate testimony.

Dr. T. W. Wiley, after qualifying as an expert, in answer to a hypothetical question had testified that a woman in the position stated and under the circumstances enumerated, could not be raped without leaving evidence of physical violence on her person, and he was then asked if a man could have carnal intercourse with a woman in that position with her consent, and it is shown by the bill that he would have answered that he could not. In this case there was no question of intercourse by consent. Mrs. Vaden testified to a case of rape; appellant testified that he at this time nor at any other time had ever had intercourse with Mrs. Vaden, and there were no facts and circumstances showing that he had intercourse with her, unless the version of Mrs. Vaden be accepted as true, and the doctor having testified that in his opinion the act could not have taken place without leaving marks of physical violence (there being no marks of violence on Mrs. Vaden), the court did not err in his ruling. The record discloses that the doctor testified, "In my opinion a woman raped under those circumstances without marks of physical violence upon her person would have to consent. In my judgment she could not be raped without marks of physical violence upon her."

In the fourth and fifth assignments in the brief is presented the questions that the jury received other and additional testimony after they retired, and discussed the former conviction of appellant. When the motion for a new trial was heard each juryman was called and testified, and each and all virtually agree that nothing of this character took place until after the vote had been taken in which they all agreed upon appellant's guilt. Some of the jurymen testify that before they had agreed on the term of punishment to be assessed that one of the jurymen, a Mr. Crockett, remarked that he was surprised that appellant took him on the jury; that appellant was aware that he the juryman knew that he, appellant, had separated a man and his wife prior to this time. Some of the jurymen say that this was before the verdict was finally arrived at; some say that it was after the verdict was reached, but before it was returned into court, and some say that it was after the verdict was rendered and the jury discharged, and that the remark was made by Mr. Crockett while they were on the way downstairs, but each and all of them testify it had no influence on any of them. Appellant does not contest the fact that he knew Mr. Crockett was aware of the circumstance mentioned, prior to the time he accepted him on the jury. Each juryman was called on to testify as to what was said about the prior verdict. One of the jurymen testified that some one remarked about appellant having been formerly convicted and had been sentenced to ten years in the penitentiary—that is, asked if this was not the case in which he had been formerly convicted, when the foreman promptly

instructed them that this could not be considered, and they must not discuss it. A majority of the jury testify they heard no such remark, and all of them say that it was not discussed, and no attention was paid to the matter. While several testify that before going on the jury they knew appellant was convicted on the former trial, they state that on their examination when asked they so informed appellant's counsel. The record discloses that on the former trial appellant received a sentence of ten years, while on this trial he gets only seven. It may be said that the evidence of all the jurymen discloses there was no discussion of the former conviction; although it may have been incidentally mentioned by one juryman who was at once informed that this matter must not be discussed nor considered, and they all say it was not discussed nor considered. If it had been discussed, of course, we would not be inclined to inquire into whether it had weight or not, but inasmuch as all say it was not discussed by any of them, but at most only incidentally mentioned in the nature of a query, this presents no error.

As to the remark of Mr. Crockett, it is practically certain that it was made after the jury had all agreed on the guilt of defendant, if in fact it was not made after the jury was discharged as contended by Mr. Crockett and some others. When they began a discussion of the penalty, four were for five years, while the remaining eight were for various numbers of years up to twenty years confinement in the penitentiary, and instead of it appearing that the four were caused (if the remark was made prior to the time the punishment was agreed on), to increase the number of years from what they first thought proper very much, those for a greater number of years afterwards came down considerably more than they were led to increase the punishment. In the case of Arnwine v. State, 54 Texas Crim. Rep., 213, the matters were carried much further than in this case, and it was held not to present reversible error. The mention of these matters in this case did not induce them to find appellant guilty, for they had already done so before these facts were mentioned as shown by the testimony. The mention of the number of years given appellant did not influence them apparently, for they proceeded to give him less than on the former trial, and they nearly all swear they did not hear the query when made about the former conviction and those who say they did hear it, say it did not influence them and was not considered by anyone in arriving at the number of years of punishment, and a majority of the jury say the remark of Mr. Crockett was made after the verdict was reached, and all say it was not discussed, and all say it did not influence them in the least, and the punishment bears evidence of this fact.

The propositions presented by the sixth, seventh, eighth, ninth and tenth assignments of error present to us a serious question, and one to which we have given much thought and study. In the case of Pefferling v. State, 40 Texas, 487, it was held: "In prosecutions of this character, the proof of the offense depends very frequently upon the testimony of the party charged to have been outraged, and in most cases, to a very

great extent, upon the truth and credibility of her evidence, and unquestionably every reasonable test should be applied to her integrity, for the safety of the accused. Hence, the failure to make outcry, or call for aid when it might have been readily obtained, or within reasonable time to discover the offense after an opportunity to do so, are circumstances tending to discredit her testimony. But if the absence of these circumstances tend to raise the presumption that her testimony is false or feigned, proof of them repels the suspicion which their absence raises. It has, therefore, been universally held that recent complaint by the person injured, her state and appearance, marks of violence, and the condition of her dress, shortly after the alleged occurrence, may be proved as original evidence." The rule thus announced by Judge Moore has been adhered to in an unbroken line of decisions, so far as we have been able to ascertain, and therein it is announced that the particulars she detailed can not be given, unless they come within the rules governing res gestae testimony, and in this case the witness was not permitted to do so, but a person will be permitted to testify as to her *state and appearance.* In this case it is shown that if the rape occurred, it was between seven and eight o'clock in the morning, and the appellant developed that Mrs. Vaden remained at appellant's farm, where she was housekeeper, until after she had gotten dinner, and did not report the matter to anyone until after twelve o'clock. To meet this the State proved that Mrs. Vaden had sent word to Mrs. Matthews asking her to come to see her; Mrs. Vaden testified she was afraid to leave the place until appellant had gone away—that she knew he was going to leave as he had told her to get early dinner because he was in a hurry to get off; that as soon as he left, she went to the house of Mrs. Matthews and there made the first complaint, and then went to the telephone and reported the matter. Mrs. Matthews was permitted to testify that when Mrs. Vaden arrived at her house she made complaint to her; that she was crying, jerking and very nervous; that Mrs. Vaden remained at her house until Sunday, and she remained in that condition while she was there. J. F. Carter was permitted to testify that about noon on the day of the alleged assault she came to the store to telephone and was sniffing and crying. J. M. Matthews was permitted to testify that when he returned home that evening Mrs. Vaden was at his house, and remained there until Sunday evening, when she went to Bob Smith's; that when he got home he saw Mrs. Vaden; that her face was red and swollen; that she was crying and trembling and very nervous, and she remained in that condition until she left his home on Sunday evening. Bob Smith was permitted to testify that when Mrs. Vaden arrived at his house Sunday evening she appeared to be in "wrecked nervous condition." All this testimony was objected to by appellant, and we may say that the testimony of the witnesses cover a period of two days after the alleged assault—that of Mrs. Matthews and Mr. Carter relating to a time about three or four hours after the alleged offense, and that of the other witnesses tending to show this condition of nervousness, etc., continued for that

length of time. We do not think it can be seriously contended that evidence of the appearance of Mrs. Vaden's state and appearance when she complained to Mrs. Matthews, and Mr. Carter saw her, is not admissible. Certainly this much is admissible under all the authorities from this State cited in appellant's brief. The only serious question presented is, was it permissible for Mrs. Matthews to testify that that condition continued to exist from Friday afternoon until she left Sunday afternoon, and was it permissible for Mr. Matthews to testify that this was her condition when he saw her late Friday evening, and that it continued until Sunday afternoon—that is, all the time she remained at his house—and was it permissible for Mr. Smith to testify that she was in a "wrecked nervous condition" when she arrived at his home Sunday afternoon.

If there had been marks of physical violence on her, and each of these witnesses saw this evidence of physical violence on her at these various periods of time, there can be no question that the testimony would be admissible; if there had been rents in her clothing, and these witnesses saw the tear at the various times mentioned, it would be admissible, and if there was force used on her person, although it did not tear her clothing or make marks on her person visible to the eye, yet the violence used to her person was of that nature to outrage the feelings of a chaste female, produce, as human experience teaches us would be the case in a case of rape by force on a refined and pure woman, a state of nervousness visible to the eye, and the shame and humiliation of it should cause her to shed tears and tremble, why is not such testimony admissible? And if the shock is of that severe character that she remained in this distraught, nervous condition for two days, is not that fact also admissible in evidence? This lady may be a consummate actress, as contended by appellant's able counsel before this court, and these evidences of a nervous, distraught condition but assumed by her, yet without positive evidence of such fact, shall we say that such is the fact and the testimony inadmissible? The fact that she remained at the house for three or four hours, and did not report the matter until she arrived at Mrs. Matthews' home, might present a state of facts upon which appellant's counsel could base a cogent argument to the jury that her condition and state were assumed, and the tears shed were not occasioned by outraged feeling, but was but the play of a designing woman, but this would go to its weight and not to its admissibility. We know of no act that would more completely shock a modest female than to forcibly violate her person, and the pain and humiliation caused by such act is calculated to produce a nervous condition that may last this length of time. Of course, we are not passing on the genuineness of this state of mind in Mrs. Vaden—that was for the jury under the evidence. She was rigidly cross-examined; her life inquired into for a number of years; her misfortune in the marital state exposed, and the question of whether or not she was of that character and nature of a woman that such an act, if committed, would naturally produce the condition testified to by the witnesses, we

are satisfied was all ably argued to the jury, based upon this character of testimony.

The time Mrs. Matthews and Mr. Carter first saw her was not too remote from the transaction to render the testimony inadmissible, and they having so testified, we think it permissible for the State to show that this state continued for a reasonable length of time.

J. M. Matthews testified he was a tenant on appellant's place, and after testifying to the condition of Mrs. Vaden (then Mrs. Proctor), on the day of the alleged offense, and in regard to the several conversations he had with appellant, among other things, testified: "I think the next conversation we had on it was in October and at that time he asked me if we didn't correspond with this lady, that is if my wife and I didn't correspond with Mrs. Proctor, and I told him that we did. And he asked when we had heard from her and I told him my wife had a letter from her a few days previous to that, and he wanted to know if I didn't think I could square the thing up for him, and I told him I didn't think I could—that was the way the conversation started. He said he thought I could and insisted on it and I told him I would do what I could and he wanted me to go to Hillsboro and I went. I went to see if I could effect a compromise in any way and get it out of court. In that connection he said he didn't want to be mixed up in it much, that Clyde was his overseer out there, that he had turned the business over to Clyde and Clyde was boss. He said whatever Clyde said was all right, that he would make Clyde his agent, and I was to get my instruction from Clyde and he would give them to Clyde. Clyde and Mr. Burge both furnished me the means to go to Hillsboro. The first trip to Hillsboro that I made Clyde furnished me ten dollars and Mr. Burge furnished me the rest which was two dollars. I told the defendant Mr. Burge that I would have to have some clothes to wear down there and he told me to come and go with him and get them and he took me to a store over here on the northeast corner of the square what used to be called the Mississippi Store, where that building fell down, and introduced me to one of the clerks whom he called Ben Estes, and told him to let me have what I wanted. I got a suit of clothes, pair of shoes, shirt, collar and tie I believe and those goods cost $17.80. I went by myself to Hillsboro and when I got down there I went to see Mrs. Vaden. I saw Mr. Vaden first and told him I was down there looking for a job, and he told me that I could probably get a job there with the Katy, and the case was brought up and I told him that I thought Mr. Burge was anxious to get the case out of court. That was all that I told him at that time. I did not make any arrangements with him with regard to the matter at that time. After I talked with him I went out to his house and saw Mrs. Vaden and after she made some statement to me then I made her a statement with regard to the case. We got to talking about the case and said that Mr. Vaden objected to her coming to court and set his foot down on it that she couldn't come, and she asked me what she should do about it. I told

her I was incapable of advising her but it seemed that she had a good home and a good man and to keep down family trouble if they could get the thing squared up some way it might be best for her, and she said that she didn't know what about it. And that if Mr. Burge would not appear against her son (wherein Barney was charged with assaulting appellant because of this matter), that she would not appear against him and she said that if she could get the county attorney to dismiss the case that under the circumstances she might agree to it. She did not say anything else in that connection—yes, she did say if she could get the case dismissed and save her character that is all that she would care about. That is all that happened the first trip. The second trip Clyde spoke to me about that, and Mr. Burge did not speak to me about the second trip, Clyde said that I must go back and see further, and I came back and reported the condition of affairs and it wasn't very satisfactory. I made the report to both of them when I came back the first trip, and I don't think the defendant said anything in that connection. With reference to the second trip Clyde said I must go back and get something more definite, that they didn't know what to do about that and for me to go back and find out what they would do, if she would sign some papers or would leave the State or if she would leave the State how much money she wanted to leave the State, and I was authorized to tell her that they would not appear against the boy—that is against Barney Young, her son. That conversation was with Clyde and Clyde furnished the money to go down there that trip—I don't remember how much money he furnished but I think though it was $12. I went by myself. When I got down there I went to see Mr. and Mrs. Vaden and I told them that they were anxious to get it settled and I thought Mr. Burge would agree to terms not to appear against the boy, and that was about all there was to tell them, they just sent me down there to find out what the other side would do and get the other side to make a proposition. Mrs. Vaden said she would not leave the State under any circumstances and the only way they could get the case dismissed would be for them not to appear against Barney, for Mr. Burge not to appear against Barney and for the county attorney to dismiss the case and save her character. When I came back I reported to Clyde—I don't think I reported to Mr. Burge that time. The next time Clyde went with me, and Clyde paid my expenses on that third trip. I do not know how much the expenses were. The expenses I think of the third trip was $12. I do not remember what was said between me and Clyde before we started on that third trip more than he just wanted me to go along with him and give him an introduction to them and kind of go along as giving him an excuse for going. At that time I think we left McKinney over here at the interurban from the station, I think so I am not sure, there were several times we did not leave from the station and I don't know that might have been one of the times. When we got down there Clyde and I went to the store and I introduced him to Mr. Vaden and they talked the case over, I didn't hear all that was said and then we went out to

the house. I did not hear all that was said between Clyde and Mr. Vaden. We went to the house and Mrs. Vaden came in and Clyde wanted her to sign papers stating that what she had his father charged with wasn't so and wanted her to leave the State. She said she wouldn't leave the State and would not sign the papers stating that it wasn't, and said that it was so. I don't remember anything else that occurred I don't believe. He had a paper there with him for her to sign—I do not know who wrote it but it was typewritten. I only have his word for who wrote it, he said their lawyers wrote it. When we came back he made a report but I was not with him. I do not remember under what circumstances the fourth trip was made but Clyde and I made it—on the fourth trip I met Clyde in Fort Worth. I went from here to Fort Worth—that was my instructions that I was to meet him in Fort Worth. He had given me my instructions before I started. He gave me the instructions personally, he told me. I don't think he went ahead of me but think he followed. He gave me the instructions out there on the place. I took the car here in McKinney. I beat him to Fort Worth, I don't know whether he left here first or I left first but I beat him to Fort Worth. After he and I met in Fort Worth we went to Hillsboro. He paid my expenses on that trip but I do not know how much it was—he gave me eight dollars to start with here and after I met him in Fort Worth he paid all expenses from there on, tickets, etc. When we went to Hillsboro that time we went out to Mr. and Mrs. Vaden's house again, and he had another paper for her to sign and she refused to sign it. I do not know what the paper contained. Practically the same things were said that were said on the other trips, he still wanted her to leave the State and she refused to go. We did not accomplish anything by that fourth trip. He and I came back together and I presume when we came back Clyde reported. I do not remember how many trips we made in all. On the fifth trip, I think it was the fifth trip, I am not positive, but I believe it was the fifth trip that we went over there to see about getting it dismissed that Mr. Vaden came back with us. I am almost sure it was the fifth trip that we went over there that Mr. Vaden came back with us. Clyde and I went on that fifth trip and went from here. I do not know whether we took the car here or at Melissa or on the hill. By on the hill I mean up there by the nursery on the hill—we took the car down there one time. When we took the car up there on the hill by Nursery we went around kind of back way to get to that place from the square, I don't know what the street was, and we walked. That is Clyde and I did that and took the car down there. We·went around the back way to take the car. Clyde paid my way down there that time. We accomplished practically nothing on that trip only got Mr. Vaden to come back with us. Vaden failed to get the case dismissed, the county attorney would not dismiss it and Vaden made the remark that he guessed the thing was all off, that he would hire some lawyers and fight it, and Clyde told him that would never do, and I left them at that time and don't know what else transpired. A while after that they called me to witness

trade that they had made and Clyde was to give Mr. Vaden seven hundred and fifty ($750) dollars for him not to employ an additional attorney and fifteen hundred if he could get the case dismissed. He was to pay him seven hundred and fifty ($750) dollars down that night, take it to Hillsboro, and I was to be given seven hundred and fifty ($750) dollars to hold until the case was dismissed, and if it was dismissed it went to Mr. Vaden and if not dismissed it went back to Clyde. That was the agreement made between them, in my presence and they called me to witness it. There was nothing said about where the money was to come from only Clyde was to deliver it at Hillsboro that night. Clyde went to a bank over on the west side of the square to get the money. Clyde wanted me to go with him and I told him it wasn't necessary for me to go and he said yes the old man wants you to go and I presume he had reference to his father, and I told him all right I would go, and I says let's go and he says well I have got to see the old man before I can go. I saw him go to the bank, that is Clyde and his father was with him. The defendant went with Clyde to the bank. When Clyde came out of the bank he came over on the corner where I was and slapped his pocket and says I have got her, let's go. We went back upon the hill that time to leave and left at the Nursery south of town. Mr. Vaden was not with us, he had already left. I do not know where he took the car. He and I did not go back together. Clyde and I left here between four and five o'clock the best of my recollection and got to Hillsboro that night about eleven o'clock and went to Mr. Vaden's house. They were up when we got there, they were fussing and Mrs. Vaden was crying, and Clyde asked her what the trouble was and she told him that Mr. Vaden had written a letter and she was to copy it, and he had put a phrase in there that she didn't want, that wasn't so, and she didn't want to copy it, and they talked over that a while and finally got it squared up and Clyde and Mr. Vaden went out on the front and talked awhile and Mr. Vaden come back to the house and Clyde called me out and says what do you think about the way this woman is doing and I says I don't know, and he says do you think she will go to court, and I says I think she will, and he says what do you think about Vaden, do you think he will do what he says he will, and I says yes I think he will, I believe he is a truthful man. And he says I am going to take a shot at the dark, I am going to let him have the money, and he handed the package to me and says give this to him. And I motioned to Vaden and he followed me into the dining room and I laid the package on the table." It contained $750.

He also testified that he went to Oklahoma, at Clyde's instance, during one term of court to get out of the way so the case could not be tried that term, and appellant paid his expenses; that at another term of court that Clyde gave his wife $25 and she got out of the way. All this testimony was objected to by appellant, but as this witness testified that appellant in his talk with him told him to do whatever his son Clyde said, that Clyde was the boss, and it further appearing by the record

that appellant delivered the $750 to Clyde, and had paid the witness' expenses at times in person, furnished clothing, etc., the testimony was admissible. At appellant's request the court instructed the jury: "You are instructed that before you would be entitled to consider or weigh in any way the evidence of any act, statement or declaration made or done by the witness Matthews at the instance or under the instructions of Clyde Burge, and not in the presence of the defendant, that you must find and believe from the evidence beyond a reasonable doubt that the defendant Ed Burge told the said witness Matthews in substance, for him to follow the instructions of Clyde Burge, that he, defendant, was backing Clyde Burge, and if you have a reasonable doubt as to whether such statement was made by the defendant, then you are instructed that you will not consider as evidence in this case any statement, act or declaration made or done by the witness Matthews at the instance or request of Clyde Burge not in the presence of the defendant, Ed Burge." And at his request he further instructed the jury: "You are instructed that before you would be entitled to weigh or consider any of the acts, statements or declarations of Clyde Burge offered in evidence in this case not made in the presence of the defendant, Ed Burge, that you must find and believe from the evidence beyond a reasonable doubt that the defendant, Ed Burge, stated to the witness, Matthews, in substance for him to follow the instructions of Clyde Burge, and that he, defendant, had given Clyde Burge instructions, and that he would stand behind whatever Clyde Burge did, and you are instructed that if you have a reasonable doubt as to whether such statement was so made then you are instructed that you can not and will not consider any statement, act or declaration of the said Clyde Burge made out of the presence of the defendant for any purpose whatever in this case."

These two charges it was proper to give, and the court having given them, there was no error in admitting the testimony of Mr. Matthews that was objected to. Neither did the court err in refusing to give the two charges instructing the jury not to consider this testimony for any purpose. If his son Clyde was acting for appellant, using money given him by appellant, and appellant had prior thereto told the witness that Clyde had charge of the matter, that he, appellant, had made him his agent, and the witness was to get his instructions from Clyde, then the acts done under the direction of Clyde would be admissible against appellant.

Neither was it proper for the court to instruct the jury that if they found that appellant had carnal knowledge of Mrs. Vaden, then her consent would be presumed until the State proved beyond any reasonable doubt that she used all means in her power to prevent it. As hereinbefore stated, there was no evidence to show an act of carnal intercourse by consent, yet out of abundance of precaution in addition to instructing the jury as to presumption of innocence and reasonable doubt in appellant's favor, he also instructed the jury: "If you find and believe from the evidence beyond a reasonable doubt that the defendant, Ed Burge,

had carnal knowledge of the said Ophelia Proctor on the 19th day of May, 1911, but you have a reasonable doubt from the evidence whether or not such carnal knowledge was without her consent and against her will; or if you have a resonable doubt from the evidence whether or not said Ophelia Proctor used every means within her power to prevent defendant from having intercourse with her, if he did, taking into consideration the relative strength of the parties and all of the other facts and circumstances in the case, then in either event you will acquit the defendant and say by your verdict not guilty." The only other special charge requested was fully covered by the court in his main charge.

It appears from the record that Mrs. Vaden (then Mrs. Proctor) advertised for a position as housekeeper; that in answer to that advertisement appellant called to see her and a trade was made. In detailing the conversation she said, as shown by a bill: "At the time that I made the arrangement with Mr. Burge to go to his place as his housekeeper I showed him my recommendation and asked him for recommendations and the man that was a writer I suppose for the paper recommended him very highly, that is the only one that I remember that recommended him. I told Mr. Burge the reason I wanted recommendations was that I was a lady and wanted to go to a nice place." This testimony was offered to show why the prosecuting witness was on appellant's place; that she testified that appellant was highly recommended to her certainly was not hurtful but beneficial to appellant, and the statement that she in that conversation told him she "was a lady and wanted to go to a nice place" would have no tendency to prove that appellant subsequent to that time raped her. It was but a recitation of a conversation that took place between them at the time of her employment, and the same facts were in substance testified to by appellant, and this bill presents no reversible error.

The only other question presented in the able and lengthy brief is that while the private prosecutor was addressing the jury, Mrs. Vaden was sitting in plain view and hearing of the jury, and cried. It is further shown that at the former trial she had cried, and appellant's counsel called the court's attention to this matter and asked that she be not permitted to remain in the presence and sight of the jury. The court in approving the bill states that Mrs. Vaden did cry sufficiently loud for the jury to have heard her, but not loud enough nor in a manner to interrupt the orderly proceedings of the court. It is well known by all members of the bar, and all the courts, that witnesses both for the State and defendant gather about during the argument of counsel; that they sometimes cry, and even counsel in presenting the cases to the jury are sometimes moved to tears. And at times eloquent counsel have even elicited tears from the jury trying the case, but if these demonstrations are not of that character as to disturb the proceedings of the court, it is seldom the court seeks to control such matters. As qualified and approved by the court, it is a matter that we would not feel called upon to hold that the trial judge had abused the discretion confided by law to him.

There are other matters presented by the record, but these are all the questions deemed of sufficient importance to be included in appellant's brief, and while we have not discussed the others, they are questions of similar import to those herein acted on, and after reading each of them we are of the opinion no reversible error is presented by this record.

Mrs. Vaden testified appellant came up behind her, grabbed her hands, pinioned them behind her, threw her on the bed and outraged her, and the judgment is affirmed.

*Affirmed.*

Davidson, Judge, dissents.

### ON REHEARING.

#### May 13, 1914.

HARPER, JUDGE.—Appellant has filed a lengthy motion for rehearing and an able argument thereon. In the first ground it is insisted that we erred in holding that the court committed no error in sustaining the objection to the following question, to the witness Matthews: "Well, don't you think that if you were entitled to a child's part of that $750, you would be entitled to a child's part of the $50,000, too," claiming that it is always permissible to introduce testimony to impeach the credit of a witness. This is no doubt true, but in this case this witness had already testified about being given one-fourth of the $750 paid by Burge to Mr. Vaden to keep his wife away from court, and in answer to the question, "Well, do you know whether you are going to get a child's part of that $50,000 that she sued for, he answered, 'No, I do not know. I do not know that they are going to get it, and do not know anything about it.'" Appellant does not state that he expected to prove that any agreement had been entered into whereby Matthews was to be given any part of the money, if any was recovered, but only that Matthews would testify that if he was entitled to a child's part of the $750, he also *thought* he ought to be entitled to a child's part of any amount that might be recovered in the suit. It having been shown that there was no agreement to pay him anything and no legal obligation sought to be shown, but only that as Vaden had voluntarily given him part of the money paid to him to keep Mrs. Vaden from court, and get her to request the county attorney to dismiss the case against appellant, that he thought if he was entitled to that amount he thought he ought to be entitled to more if money was recovered in the suit, would have no bearing on this case, nor on the weight of his testimony. Had appellant stated in the bill he expected to prove, directly or indirectly, circumstantially or otherwise, that there was an agreement or understanding of any character that Matthews was to receive any portion of the money, if any was recovered, there would be merit in his bill, but the question propounded and to which objection was sustained, or the answer stated he expected to be made to the question, would have no such bearing. The wide range the court had already allowed in the cross-examination of this witness was amply

sufficient to show any interest or bias he might feel or have in the case. The authorities cited by appellant on this question do not sustain his contention, but all of them only go to show that the motive of a witness, his interest or bias, may always be shown and this is unquestionably the law, but the question here propounded would throw no light on his motive, nor his interest, nor that he was biased in favor of the prosecuting witness.

Appellant for the first time in his motion for rehearing in this court claims that the court erred in not instructing the jury that Mrs. Vaden and J. M. Matthews were accomplices, asserting that as it is shown that Burge paid $750 to Vaden to get Mrs. Vaden to write a letter asking that the case be dismissed, and Vaden had given Matthews one-fourth of that amount, this made them accomplices, and the court should have so instructed the jury. No such contention was made in the court below at the time of the trial; nor in the motion for a new trial, and, if the court should so have instructed the jury, it would be too late to raise such question while the case is pending in this court on motion for rehearing. (Chap. 128, Acts 33rd Legislature, p. 278.) However, this testimony would not raise such an issue. Mr. Branch, in his work on Criminal Law, correctly states the law to be: "Witness is not an accessory or accomplice and no charge on that subject is required from the fact there is evidence that the witness offered or accepted money to leave the State, or desist from prosecution; the fact that one compounds a felony does not of itself make such party an accessory to the felony compounded." Citing Chenault v. State, 46 Texas Crim. Rep., 351; Robertson v. State, 46 Texas Crim. Rep., 441; Chitister v. State, 33 Texas Crim. Rep., 635; Smith v. State, 51 Texas Crim. Rep., 137; Davis v. State, 52 Texas Crim. Rep., 332. The only case sustaining appellant's contention is that of Gatlin v. State, 40 Texas Crim. Rep., 116, but that case was shortly thereafter overruled in the Chenault case, supra, and the Chenault case has been followed since that time.

The second ground of the motion is that we erred in holding that the witness could testify whether or not Mrs. Vaden was in a nervous, distressed condition when they saw her. We discussed this so fully in the original opinion we do not deem it necessary to do so again, and would not do so except that appellant notes one question and answer not taken cognizance of by us. After Mrs. Vaden had testified to her condition, after she claimed she had been assaulted, she was asked how long this condition lasted, and she said for about a week. This and other questions in the case are discussed in the case of Jacobs v. State, 66 Texas Crim. Rep., 146, 146 S. W. Rep., 558, and it was there held that it was permissible to testify that from the injuries received the lady who had been raped was confined to her bed for two or three weeks.

All the other questions in the motion for rehearing are fully discussed in the original opinion, and the motion for rehearing is overruled.

*Overruled.*

DAVIDSON, JUDGE.—Without discussing the legal questions urged for reversal, I am persuaded there is wanting that degree of force necessary to constitute rape by force. It may be difficult sometimes to draw the line between force and consent, but it is too thin here for conviction.