GUADALUPE GARZA v. THE STATE.

No. 15180.  Delivered April 20, 1932.
Rehearing Denied June 8, 1932.
Reported in 50 S. W. (2d) 322.

The opinion states the case.

*E. G. Brown,* of Corpus Christi, and *K. D. Hall,* of Refugio, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; penalty assessed at death.

In substance, the state's evidence describing the tragedy is as follows: Guadalupe Garza shot J. R. Weathers, inflicting a wound resulting in death. Weathers was a section foreman for the Missouri Pacific Railroad Company. Garza was a member of the section crew consisting of four men. The section house was at a place called Greta, about six miles from the town of Refugio. After a visit to the town of Refugio, Weathers, his wife and child returned about ten o'clock at night. Garza and another member of the section crew, named Argota, were in the yard near their quarters, a few yards from the house of the deceased. They were engaged in a conversation and were quarreling and fighting. Weathers approached and asked them what the trouble was. Appellant was abusive and was told by Weathers to go to his room and go to bed. Later, Weathers heard a disturbance and said to his wife that he must go back and put them to bed. Weathers met both Garza and Argota. Garza put his arm around Weathers and said: "Come on, go to my room; I am not mad at you; let's be friends." They walked together to Garza's room. Soon thereafter a shot was fired. Mrs. Weathers rushed to Garza's room and found that her husband had been shot. Weathers was lying upon the floor. He said many times, "Lupe, why did you shoot me?" Garza (called Lupe) was standing over the deceased with a pistol in his hand. Nothing was said by appellant until called upon to aid Mrs. Weathers in removing the deceased. Appellant refused, applying to the deceased a vile epithet.

The appellant's version of the homicide is summarized in his brief as follows:

"Mr. Weathers went over and asked them what was the trouble, and

told them to go to bed. Appellant contends that Mr. Weathers asked him about his (appellant's) wife and appellant in reply told Mr. Weathers that he did not have any business with appellant's wife, whereupon Mr. Weathers * * * knocked him down and kicked him.

"Then appellant and Luciano Argota went to Argota's room. Mr. Weathers went again to them and as he was on his way, he met appellant coming out of Argota's room. There was another argument concerning appellant's wife. The State contends that appellant asked Mr. Weathers to go to his room with him and have a bottle of beer and immediately upon entering the house * * * appellant shot Mr. Weathers, while appellant contends that the argument over appellant's wife led to Mr. Weathers again assaulting him, whereupon appellant, being afraid that Mr. Weathers would kill him, shot him."

Appellant testified in his own behalf and introduced testimony to the effect that Weathers was a man of violent disposition and reputation. He also testified to instances within his knowledge illustrating the character of the deceased. From the appellant's testimony, it appears that at the time Weathers' family returned, he and Argota were engaged in a friendly talk and were playing the phonograph. We quote from the appellant as follows: "We just was talking; then he asked me whether my wife was come. I told him that did he have any business with my wife. He told me, 'You hush,' and he kicked me and hit me. He knocked me down and he stay on top of me and hit me again. He said something about killing a Mexican. His wife was there, some four or five feet distant."

Appellant told the deceased that if he fired Rafael (another Mexican who was a member of the section crew) he would also quit. Again quoting the appellant: "He told me I didn't need to quit. * * * I decided to get off from there and I went to my room—to the kitchen. I had two rooms. Then he walked behind me and telling me that he had nothing with my wife. She was a good lady. He told me I was a good man. I could stay; didn't have to quit, but he was going to make that other fellow quit when he came home. I told him that if he fired him I will go. He told me, 'You can go as quick as you want to, s— of a b—.' He was just behind me at the time. When I pulled the trigger, before he catch I pulled the trigger, make the way. * * * I didn't have any ill feeling towards Mr. Weathers at all. He just got through beating me. He hit me once, knocked me down; he hit me once again. He hit me once in this eye here. I couldn't see out of this eye for two days. * * * I didn't want to shoot Mr. Weathers. He forced me to do it because he knocked me down outside, in my room, and that after he tried to fight me again in inside, he was going to kill; big man like he; I don't know what to do."

Appellant said further that he was afraid of the deceased and knew that he was a fighting man.

Argota testified for the state in substance as follows: After staying in the yard a short time talking to appellant and the witness, the deceased was invited by the appellant to go to the house and drink beer. Weathers asked the witness to accompany them. The three went to the appellant's house, which consisted of two rooms. Appellant gave Weathers a bottle of beer, while the latter was at the door of the room. After giving Weathers a bottle of beer, the appellant backed back and shot him. The witness did not see the pistol as there was little light in the room. About a minute or less after Mr. Weathers took the bottle of beer from the appellant, the witness heard a shot.

The complaint in bill of exception No. 1 is that Mrs. Weathers was asked if she knew whether the deceased had discharged or transferred appelant. She replied that deceased told the appellant "if he wanted to work he would have to work in Refugio; that he (Weathers) couldn't use four men any longer." On cross-examination, she was asked if she heard the deceased make that statement to the appellant, to which she replied in the negative, but said that her husband told her that he did. Counsel for appellant then requested the court to strike out the answer given by the witness. The court remarked that no objection had been made to it. Counsel for the appellant claims in his bill that the answer was hearsay. From the qualification of the bill, it appears that apppellant testified that on the day Weathers was shot, he told appellant he was going to be transferred to the Refugio gang; that he (Weathers) had four men out there and the company would let him have only three. It also appears from the qualification that the same statement in substance came into the record through the dying declaration of Weathers. It appears from the statement of facts that the appellant, without objection, testified to the same fact as that of the wife of the deceased mentioned above. The evidence referred to, having come into the case through the testimony of the appellant without objection, the testimony of the wife of deceased to the same fact cannot be made the basis for a reversal. See Bonilla v. State, 108 Texas Crim. Rep., 603, 2 S. W. (2d) 248; Reusch v. State, 119 Texas Crim. Rep., 112, 45 S. W. (2d) 209, and precedents therein cited.

Bill No. 2 reflects the objection to the testimony of Ira Heard, sheriff of Refugio county, upon behalf of the state. The bill is difficult to comprehend, but seems directed at the dying declaration and the predicate therefor. It is in question and answer form, and is qualified with the statement that the testimony was admitted on account of being res gestae of the shooting, and being a dying declaration; that other evidence introduced prior to the testimony mentioned convinced the court that the necessary predicate had been laid for the introduction of the statement

made by the deceased and the sheriff under both of the rules mentioned. The court refers to the testimony of J. W. Harden, Mrs. Thompson, and Ira Heard, and makes certain pages of the statement of facts a part of the qualifications. From the statement of facts, it appears that, soon after Weathers was shot and while he was in great pain, shortly after he had been put to bed in his room, he made statements to the witnesses mentioned by the court in his qualification. Deceased said he was going to die; that he would never get up; that he was dying. He said a number of times that he was in a dying condition.

Mrs. Thompson testified that she heard a shot and heard Mrs. Weathers scream; that she and Mr. Hardin went to the appellant's room where the deceased was lying on the floor. Mrs. Weathers had gotten her husband to the door. The deceased said: "I am shot; I am a dead man. He killed me; he shot me in the back." When assisted to his bed, Mr. Weathers said a number of times that the appellant shot him in the back; that he was dying.

Dr. Strong was in the room while Mrs. Thompson and Mr. Hardin were there. Heard, the sheriff, was also present, at the bed of the deceased, having reached there a short time after the other persons mentioned had arrived. Deceased said to the sheriff that he would not recover; that he was going to die; that the appellant had shot him. Deceased said he had just returned from town; that the appellant and another Mexican were squabbling and he went out to quiet them; that he told them to go to bed; that they commenced squabbling again and he went back to them; that appellant said, "Come on with me." Weathers accompanied the appellant, and just as Weathers got in the door he was shot by the appellant. The appellant had been discharged; that is, let off, that day.

Much of the testimony of which complaint is made was res gestae, consisting of statements made by the deceased immediately after he was wounded. Many of the statements were made in the presence of the accused, and before the deceased was removed from the place where he received the fatal wound. The declarations of the deceased showing that he was conscious and aware of impending death, supported by the testimony showing the seriousness of his wound, formed a sufficient predicate for the reception of any part of the declaration of the deceased which would be classified as a dying declaration. On the subject of dying declarations, see Branch's Ann. Tex. P. C., secs. 1862 and 1863, and cases cited, among them Ledbetter v. State, 23 Texas App., 256, 5 S. W., 226; Fulcher v. State, 28 Texas App., 472, 13 S. W., 750; Taylor v. State, 38 Texas Crim. Rep., 563, 43 S. W., 1019; also Vernon's Ann. Tex. C. C. P., 1925, vol. 2, art. 725, and precedents cited. On the subject of res gestae, see Branch's Ann. Tex. P. C., sec. 83, and precedents cited, among them Boothe v. State, 4 Texas App., 208, and numerous others.

Bill No. 3 challenges the ruling of the court in receiving in evidence the testimony of Ira Heard in which he described his movements in making the arrest of the appellant. Inquiry was made of the sheriff about a .38 calibre automatic pistol which belonged to the appellant. The sheriff described the mechanism of the pistol. The pistol does not appear to have been introduced in evidence, nor was any further statement made about it so far as the bill shows.

Bill No. 4 complains of the presence of the wife of the deceased in the court room during the argument of the attorneys. It seems that she was first brought within the bar, and, upon objection of the appellnnt's attorneys, she was removed to a more remote place where she remained seated during the argument, she having a 5-year-old child with her. The bill is qualified to the effect that the court did not select the seat within the bar for the wife of the deceased, but on objection of counsel removed her to a point some twenty or twenty-five feet from the jury. She was not at all times in view of the jury; there being other people seated between her and the jury. The complaint cannot be sustained. See Burge v. State, 73 Texas Crim. Rep., 505, 167 S. W., 63; Wood v. State, 80 Texas Crim. Rep., 398, 189 S. W., 474.

Bill No. 5 is a complaint of the argument of the district attorney in which he said:

"Gentlemen of the Jury: I have stood before juries of this county and asked them when I thought a defendant had unfortunately committed a crime, to suspend their sentence. In this case I believe and am of the opinion that this defendant deliberately with malice aforethought killed Mr. Weathers, and I think that it is the duty of a jury and your duty to inflict the severest punishment provided by law.

"Mr. Brown, attorney for the defendant, takes great delight in jumping on me, but in this case I cannot but question his motives when he tells you gentlemen that under this evidence you should return a verdict of less than the supreme penalty."

It is inferable from the remarks of which complaint is made that they were in response to the argument of counsel for the accused. The suggestion of punishment seems not a personal opinion but a deduction from the evidence before the jury. To justify reversal because of remarks of counsel, they must not only be improper, but under the circumstances of the particular case, must be calculated to injuriously affect the result. Many precedents are cited in the case of Shield v. State, 118 Texas Crim. Rep., 509, 38 S. W. (2d) 76, also in Todd v. State, 93 Texas Crim Rep., 553, 248 S. W., 695, in both of which cases the judgment assessing the death penalty was affirmed. The remarks in question are not deemed adequate ground for a reversal of the judgment.

In the motion for new trial, it is claimed that during the deliberation of the jury, a member remarked that, if the appellant had not suc-

ceeded in killing Weathers in his room as he did, he would in all probability have returned that night and murdered Weathers and probably have killed his family. The making of this remark was denied by juror Ryals. Juror Jones said that he heard the remark, but that it was after the verdict had been rendered. Jones' best recollection of the remark was that if the appellant had not killed Weathers at the time, he would have probably have murdered his family after they had gone to bed. This remark occurred after the verdict had been completed, written and signed, and while the jury was waiting to turn it i.n Juror Somner denied hearing such remark. Juror Ryals denied hearing such remark, but said there was some remark made that appellant might have killed Mr. Weathers that night, or that he might have done so in the future. The jurors mentioned were the only ones who testified, as shown by the court's qualification of the bill of exception. Under the evidence before him, the trial court would have been justified in concluding that such remarks as were made on the subject were after the verdict had been agreed upon and prepared and while they were waiting to deliver it to the judge. Under such circumstances, the finding of the judge is binding upon this court and unless it is shown by the record that his conclusion was clearly wrong. See Holt v. State, 51 Texas Crim. Rep., 15, 100 S. W., 156; Lamb v. State, 98 Texas Crim. Rep., 358, 265 S. W., 1035; Johnson v. State, 118 Texas Crim. Rep., 454, 40 S. W. (2d) 111. It is quite questionable whether the bill, as presented, deals with a subject admissible upon the claim that there was misconduct of the jury. The remarks, if made, were in the nature of argument, a subject which is regarded as not open to inquiry upon motion for new trial. Upon the subject, it has been said by this court: "If it were permitted to attack and set aside a verdict because of arguments and reasons advanced and urged by jurors in their deliberations thereon, it would destroy free discussion and interchange of opinions among jurors. It would open the door to a searching inquiry in relation to every act and word which transpired in the jury room, and would subject each individual· juror to be placed upon trial before the court to answer for the soundness and propriety of the opinions expressed by him in the jury room. There is no warrant in the law for such a practice." Jack v. State, 20 Texas App., 661. See Todd v. State, 93 Texas Crim. Rep., 554, 248 S. W., 695; Allen v. State, 114 Texas Crim. Rep., 81, 21 S. W. (2d) 527, and cases cited.

The impeachment of a verdict with the means indicated in the present appeal has not, so far as the writer is aware, received the sanction of this court. See Ross v. State, 100 Texas Crim. Rep., 296, 273 S. W., 582, and cases cited in the opinion on motion for rehearing.

Bill No. 7 reflects the complaint that the court refused to postpone the hearing of the motion for new trial. The reason given was that the

attorneys for the appellant had been engaged in a civil suit for several days, and had not had time to sufficiently prepare the motion for new trial. In qualifying the bill, the court states that he delayed the hearing of the motion until the last day of the term. No cogent or legel reasons for the delay are revealed. No injurious consequences are claimed to have resulted, and no abuse of the discretion of the trial judge is apparent.

The issues arising from the evidence were submitted to the jury in a charge against which no exception was directed, and in which no failure to fully guard the appellant's right has been perceived. The jury was instructed upon the law of murder without malice, and the charge contains appropriate and adequate instruction upon the right of the appellant to act in self-defense upon real or apparent danger. The testimony of the state is such as to warrant the conclusion by the jury that, in killing the deceased, the appellant acted upon malice aforethought and without legal excuse. The jury decided that the state's evidence was true, and rejected the truth of the appellant's defensive theory. The verdict, which is within the purview of the law and the discretion of the jury, is binding upon this court.

Upon the record, as understood by this court, it has no option other than to order the affirmance of the judgment of conviction, which is accordingly done.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant has filed a motion for rehearing, which, because of its courtesy, and the extreme penalty the conviction carries, has caused us to carefully re-examine the record. Regarding the alleged misconduct of the jury, we think nothing can with profit be added to what was said in our original opinion. The conclusion then reached and announced has only been confirmed as the result of further consideration.

In the motion there is called to our attention certain evidence which goes to the impeachment of the state's witness Argota in that appellant's witnesses gave testimony that Argota had made statements to them regarding incidents leading up to the killing which were contradictory of his evidence at the trial. There is in the record the state's testimony supporting Argota that he had made to others substantially the same statements regarding the matter as was given in evidence by him before the jury. This presented an issue which the jury could consider in determining the credibility of Argota and the weight to be given his testimony, when considered in connection with all the other circumstances in evidence before them, but as found in the record before us would

furnish-no adequate ground for interference with the verdict nor the judgment based thereon.

The motion for rehearing is overruled.

*Overruled.*